PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-2210
_____

SARA R. REEDY,
                                        Appellant

                        v.

FRANK S. EVANSON, individually and
in his official capacity as a Police Officer of the
Township of Cranberry; STEVE MANNELL,
individually and his official capacity as the
Public Safety Director of the Township of
Cranberry; KEVIN MEYER, individually and in
his official capacity as a Police Officer of the
Township of Cranberry

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 06-cv-01080)
District Judge:  Honorable David Stewart Cercone

_____

Argued March 11, 2010

Before:  BARRY, JORDAN and VAN ANTWERPEN,
*Circuit Judges*.

(Filed: August 02, 2010)
_____

David V. Weicht   [ARGUED]
Leech, Tishman, Fuscaldo & Lampl
525 William Penn Place
30th Floor, Citizens Bank Building
Pittsburgh, PA   15219

   *Counsel for Appellant*

Charles W. Craven   [ARGUED]
Marshall, Dennehey, Warner, Coleman & Goggin
1845 Walnut Street - 8th Fl.
Philadelphia, PA   19103

Scott G. Dunlop
Marshall, Dennehey, Warner, Coleman & Goggin
600 Grant Street
2900 U. S. Steel Tower
Pittsburgh, PA   15219

   *Counsel for Appellees*

Terry L. Fromson
Women's Law Project

125 South 9th Street , Suite 300
Philadelphia, PA 19107

*Counsel for Non Party Amicus Appellant*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

While working as a cashier at a convenience store, nineteen-year-old Sara R. Reedy was sexually assaulted and robbed at gunpoint by a serial sex offender. She reported the crime to the police within minutes, subjected herself to a rape kit examination, and gave detailed and consistent statements to law enforcement officers and hospital staff. However, Detective Frank Evanson of the Cranberry Township, Pennsylvania Police Department, the lead investigator assigned to Reedy's case, believed that Reedy had fabricated the incident to cover up her own theft of cash from the convenience store. Approximately three months later, Evanson also became the lead investigator on another sexual attack that was substantially similar to the assault on Reedy and that Evanson knew was suspected to be the work of a serial rapist. Six months after the assault on Reedy, Evanson filed a criminal complaint against her, charging her with falsely reporting a crime, theft, and receipt of stolen property. Reedy spent five days in jail. The charges against her were dropped only when the serial rapist was captured and confessed to assaulting her, to committing the theft, and to committing the other sexual assault investigated by Evanson.

3

Reedy later commenced this suit in the United States District Court for the Western District of Pennsylvania under 42 U.S.C. § 1983 against Evanson and another Cranberry Township Police Officer, Kevin Meyer, and the Township's Public Safety Director, Steve Mannell. She asserted claims of unlawful seizure and unlawful search under the Fourth Amendment, and accompanying state law claims of false arrest, false imprisonment, abuse of process, and intentional infliction of emotional distress. The District Court granted summary judgment to the defendants on all of Reedy's claims, and this appeal followed. For the reasons described below, we will vacate in part, reverse in part, and affirm in part, and will remand the case for further proceedings.

## I.      Background

### A.      *The Assault*

Because it is necessary to demonstrate the similarities between the assault on Reedy and the other sexual assault that Evanson was investigating, a graphic description of events is, unfortunately, required.

On July 14, 2004, Reedy was working alone as a cashier at the JG Gulf Station (the "store" or "Gulf Station") in Cranberry Township, located in Butler County, Pennsylvania. At approximately 10:40 p.m., a man later identified as Wilbur Brown entered the Gulf Station. He walked toward the counter where Reedy was standing, lifted his shirt, pulled out a gun, and ordered Reedy to sit on the floor behind the counter while he opened the store's cash register by pushing the "no sale" key.

4

Although the store was equipped with a panic alarm button, Reedy did not press it. After Brown removed the money from the register, he ordered Reedy to take off her shirt, which she did. He faced her, stared out the store's window, unzipped his pants, and exposed himself. He then began to sexually assault Reedy, fondling her breasts and forcing her to perform oral sex on him. While she was doing so, he yelled, "Suck my dick and don't bite it or I'll shoot you." (App. at 350.) He also told Reedy to insert her finger into his anus, which she did. Brown then ejaculated in Reedy's mouth and threatened to harm her if she did not swallow all of his semen.

After the assault, Brown ordered Reedy to go to the back of the store, where there was an office that held the Gulf Station's safe. When Brown noticed that the store's safe was partially open, he asked Reedy if there was any money inside, to which she responded that there was. Brown or Reedy[1] then removed two envelopes of money from the safe. Brown next ordered Reedy to disable the telephone, which she did by pulling the lines from the wall. Finally, he ordered Reedy to remain in the back office for a few minutes while he left. He then fled through the front door of the store. After waiting for a short while, Reedy exited through the back door of the store and ran to a neighboring service station for help. One of the employees there called the police to report the robbery and sexual assault.

---

[1]It is unclear from the record whether Reedy removed the money from the safe on Brown's command, or whether Brown removed the money himself.

B.     *The Initial Investigation*

Officers from the Cranberry Township Police Force arrived at the scene within minutes, and Reedy's boyfriend, Mark Watt, whom she had called, arrived shortly thereafter. Reedy provided one of the police officers, Charles Mascellino, a detailed description of the assault. She also described her assailant as a white male, approximately 5'6" to 5'7", wearing a blue baseball cap, blue jeans, and blue boxer shorts, and appearing in his mid-30s to early 40s.[2] Reedy was unsure of which direction her assailant went when he left the store, and she could not provide a description of any vehicle he might have used. Reedy was "crying, shaking, talking real loud," and "hysterical" during the interview. (App. at 252 p. 20.) One of the officers offered Reedy the services of a sexual assault

---

[2]Reedy's description of her assailant's age is in dispute. The police report indicates that Reedy described her assailant as appearing between 28 and 31 years of age. Similarly, the affidavit of probable cause that Evanson filed against Reedy months later when he charged her with criminal activity (the "Affidavit") also states that Reedy described her assailant as appearing between 28 and 31 years of age. Reedy, however, maintains that she advised the police officers that her assailant was in his mid-30s to early 40s. Moreover, the record shows that in her later statement to a nurse that same night, Reedy described her assailant as appearing to be in his mid-30s to 40s. Drawing all inferences in Reedy's favor, the District Court considered Reedy to have described the assailant as in his mid-30s to early 40s.

counselor but she refused, stating that she had been sexually abused as a child and knew how to handle the situation. The officers searched the wooded area behind the Gulf Station but could not locate Reedy's assailant. An alert for the suspect was broadcast around the local area. Four fingerprint specimens were taken at the Gulf Station but none of them yielded any useful forensic findings.

C.    *The Hospital*

Mascellino took Reedy and Watt to the University of Pittsburgh Medical Center in Cranberry Township, where Reedy underwent a rape kit examination and where she first met Detective Evanson. Evanson was the lead detective assigned to investigate the incident. He had been a police detective for Cranberry Township since 1986 and, by the time of these events, had investigated more than ten rapes in his career. On the night of the incident, Evanson traveled to the hospital, where he introduced himself to Reedy and asked her what happened. She provided an account of the assault that matched in detail what she had told Mascellino. Reedy later said that, after hearing her description of the attack, Evanson asked her how many times she did "dope" each day. (App. at 396.) He then called her a liar and repeatedly accused her of stealing the money from the store. He asked Reedy where she had put the stolen money, to which she responded that she did not know where the money was. When Reedy began to cry under this hostile questioning,

7

Evanson told her not to bother, "because [your] tears aren't going to save [you] now."[3]  (App. at 398.)

After speaking with Evanson, Reedy provided another full and consistent description of the assault to Mary Beth Farah,[4] the nurse who was treating her and who administered the rape kit.  According to Farah's notes from the conversation, Reedy told her that none of the assailant's semen had gotten onto her face and that, during the few minutes she was forced to wait in the back room while her assailant escaped, she gargled with water twice and washed her hands with soap.  She also told Farah that Evanson had called her a liar.  In sum, by the time the night of the assault was over, Reedy had provided separate, detailed, and consistent accounts of the incident to Mascellino, Farah, and Evanson, and had been accused by Evanson of being a liar and a thief.

During their confrontational conversation at the hospital, Evanson took note of Reedy's physical appearance.  He said that her eyes looked dilated and that her speech was slow.  According to Evanson, he asked Reedy if she had "consumed prescribed or unprescribed narcotics," to which she responded

---

[3]In his deposition, Evanson denied asking Reedy about the location of the money, and said he did not recall making the statement about her tears.

[4]The record and the briefs contain references to both a Mary Beth Farrah and Mary Beth Farah.  We have adopted the latter spelling, as used by the District Court.

she had not.  (App. at 351.)  Shortly thereafter, Evanson learned that Reedy's urine samples had tested positive for marijuana. He asked Reedy if she had used marijuana recently, and she answered that she had smoked it five or six days ago but had not consumed any other medication.  According to Evanson, "[t]hat information led [him] to question [Reedy's] credibility and to ask the hospital to test for drug usage ... blood samples that had been taken [from Reedy] ... as part of the 'rape kit' ... ." (Appellees' Answering Br. at 7.)  Thus, without speaking to Reedy, Evanson directed the hospital to perform additional toxicology testing on Reedy's blood samples.

Eight days later, on July 23, 2004, Evanson obtained and executed a search warrant for Reedy's medical records.  The records included the results of the additional toxicology screening that Evanson had ordered, which revealed that Reedy had ingested diazepam, better known as Valium, and confirmed that Reedy had used marijuana.  When Evanson later asked Reedy about the diazepam, during a visit he made to her home a couple of weeks later,[5] Reedy explained that Watt, who had a legal prescription for the drug, brought her a pill on the night of the assault to "assist her in calming down."  (*Id.* at 356.)

D. *Information From The Gulf Station's Manager*

---

[5]*See infra*, Section I.F.

In the days following the incident, Evanson spoke with Carol Hazlett, Reedy's supervisor at the Gulf Station.[6] Hazlett told Evanson that, on the day of the attack, she left the Gulf Station at 3:00 p.m., when Reedy's shift began.[7] At approximately 11:20 p.m. that night, she returned to the Gulf Station because she had received a phone call at her home from Security Systems of America ("SSA"), the Gulf Station's security monitoring company, informing her that there had been an interruption in the power source for the store's alarm system.[8] SSA called Hazlett at home after receiving no answer when it attempted to call the Gulf Station. A report from SSA reveals that Hazlett was notified at approximately 11:15 p.m. about a power failure that had occurred at approximately 10:15 p.m.

---

[6]It is not clear exactly when Evanson met with Hazlett. However, it appears from the police report that it happened at some point between July 15 and 18, 2004.

[7]Evanson wrote in the Affidavit that Hazlett left the store at 9:15 that evening (rather than 3:00 p.m.) but Hazlett stated in her deposition that she left the store at 3:00 p.m. The District Court proceeded on the premise that Hazlett's departure time was 3:00 p.m.

[8]Evidently, the power source for this alarm system was different than the power source for the store's panic alarm. Police officers tested the panic alarm on the night of the incident, before the power to the store's SSA alarm system had been restored, and discovered that the panic alarm was working. (App. at 333, ¶ 128; 662, ¶ 128.)

The day after the incident, Hazlett went back to the Gulf Station. When she was in the back room trying to fix the phone lines that had been torn from the wall, she noticed that the alarm system's power cord, which was located behind a desk, had been unplugged. She also learned, by looking at the Gulf Station's cash register tape, that the register had been opened by pressing the "no sale" key at the exact time that Reedy had noted. Finally, Hazlett discovered that $606.73 in cash was missing from the store.

### E. *Meeting at the Police Station*

On the morning of July 15, 2004, while Reedy was still in the hospital, Evanson requested that she come to the police station to provide a written statement to the police. The next day, July 16, 2004, she traveled to the Cranberry Township Police Station with her mother and stepfather, where she provided a detailed, written statement about the incident.[9] Her

---

[9]In the Affidavit, Evanson stated that Reedy did not come to the police station until July 23, 2004. He also wrote that he had attempted to contact Reedy for several days (from July 15-23) but was unsuccessful. Reedy's mother, however, testified that she called Evanson on July 15, the day after the incident, and arranged for her and Reedy to travel to the police station the very next day. Reedy, her mother, and her stepfather, all testified that they went to the station and met with Evanson on July 16, 2004, the first day that Reedy was out of the hospital. Drawing all inferences in favor of Reedy, the District Court proceeded on the premise that Evanson spoke with Reedy's

description again matched what she had previously told Mascellino, Farah, and Evanson. She also included the assertion that Evanson had accused her of lying.

While Reedy was writing her statement, Evanson spoke with Reedy's mother and stepfather, Debbie and Paul Bosco, Jr. He suggested that Reedy and Watt were responsible for the theft at the Gulf Station and that he would soon be able to prove it. He told the Boscos that, on the night of the attack, Watt had not gotten out of his car right away when he arrived at the scene, which Evanson thought was suspicious. Evanson also told them he found it suspicious that Reedy had reported that the crime happened around 10:40 p.m. and that the cash register had been opened at exactly that time. In his view, "nobody that's in this kind of a hysteria would know exactly what time it was, so she had to have preplanned this because nobody would know this." (App. at 448-49.) Finally, he told Reedy's parents that "the sooner [Reedy] confessed ... he could wrap it up." (*Id.* at 449.) He warned the Boscos that it was only "a matter of time ... before he tied up the loose ends and put it all together so it would be in [Reedy's] best interest if [they] would encourage her to ... admit it." (*Id.* at 22 (first and third alterations in original).) He also told Paul Bosco that he wanted to "burn" Watt.[10] (*Id.*)

---

mother on July 15, 2004, and that Reedy and her family met with Evanson the next day, on July 16, 2004.

[10]In his deposition, Evanson conceded that some of this conversation occurred. Specifically, he stated that while Reedy

was writing out her statement, he expressed to Reedy's mother that Reedy's story was suspect because it contained what he viewed as critical gaps in information. He also conceded that he spoke with Reedy about the security alarm system and about his suspicion surrounding the fact that she was able to report the exact time that the cash register was opened. However, Evanson

Evanson then spoke directly with Reedy. He asked her about the alarm being unplugged. Specifically, he asked whether she had been ordered to disable any wires besides the phone lines on the night of the incident, and, if so, where those wires were located. Reedy responded that she did not believe that the assailant had disabled anything other than the phone line and, thus, did not know how the alarm system had been disabled.

According to Evanson, when he asked Reedy how the power failure on the alarm could have occurred, she grew "verbally abusive" and stated "I just want to drop the whole thing" and "I just want this whole thing to go away." (*Id.* at 197-98 ¶¶ 47-48.) According to Reedy, on the other hand, Evanson was hostile toward her during the meeting and repeatedly accused her of lying and of taking money from the store. Therefore, according to Reedy, any hostility or desire on her part to end the proceedings was due to "Evanson's hostility, baseless accusations and badgering." (*Id.* at 321 ¶¶ 47- 48.) Reedy's stepfather also stated that Reedy was not "verbally abusive" during the interview but was simply "upset" at being falsely accused less than two days after being sexually assaulted.[11] (*Id.* at 451-52.)

_____

denied discussing Watt's behavior and denied telling the Boscos that it would be better for Reedy if she confessed.

[11]Evanson also asked Reedy if she would be willing to take a polygraph test, and she agreed to do so. The test results were

14

F. ____*Meeting at the Trailer Park*

On August 17, 2004, Evanson and Detective Kevin Meyer, another detective from the Cranberry Township Police Force, went to the trailer park where Watt and Reedy were living.[12]  According to Reedy, the officers asked her to step outside her trailer.  She did so and they had her sign a waiver of her *Miranda* rights.  They then began to press her to change her earlier written statement about the assault.  Evanson presented Reedy with the hospital toxicology report and demanded to know why her blood contained illegal substances.  In her deposition, Reedy described the encounter with Evanson, saying, "I asked him to leave several times, just leave, leave me alone.  [I said] I'm not changing my statement.  And he refused.

_____

ultimately inconclusive and do not appear to have played any role in the investigation or subsequent legal proceedings.

[12]Sometime during the second half of July 2004, Meyer learned from David Kriley, manager of the Green Acres Trailer Park, that, on July 19, 2004, five days after the assault at the Gulf Station, Reedy and Watt applied to rent a mobile home and agreed to a monthly rent of $365.00, with a security deposit of one month's rent prior to moving in.  On their rental application, Reedy and Watt indicated that Catholic Charities would provide $200.00 toward the initial security deposit.  On July 20, 2004, Watt provided Kriley with $165.00 in cash to fulfill the remainder of the security deposit.  These sums later figure into the District Court's consideration of whether Reedy had stolen cash from the store.

... He had me completely hysterical, and, ... [i]t was totally embarrassing, insulting."[13]   (*Id.* at 407-08.)   This meeting appears to be the last investigative effort regarding Reedy that Evanson took before he charged her nearly five months later with making false reports to the police, theft, and receiving stolen property.

G.      *The Landmark Attack on October 13, 2004*

On October 13, 2004, approximately three months after the attack on Reedy, another woman was sexually assaulted and robbed at gunpoint in Cranberry Township.  That attack, which occurred while the woman was leaving the Landmark Building, was the only other reported sexual assault in Cranberry Township in 2004 and was also assigned to Evanson as the lead investigator.  The Landmark attack bore several similarities to the attack on Reedy:[14]

_____

[13]In his answer to Reedy's amended complaint, Evanson acknowledged that he and Meyer visited Reedy and Watt on August 17, 2004, but admitted only to offering to "drop" criminal charges against Reedy if she passed a polygraph test. (App. at 120, ¶ 25.)

[14]There were also differences between the two incidents. Notably, the Landmark incident left physical, corroborative evidence in the form of semen on the victim's shirt that led to DNA matches with other sexual assaults.  However, there was no physical evidence from the Reedy attack that could have led to a DNA match.

16

- Both occurred in Cranberry Township, separated by 3 months.

- Both occurred at businesses located on Route 19, approximately 1.5 miles apart from one another.

- Both attacks occurred at the same time of evening – approximately at 10:40 p.m.

- In both attacks, the assailant made no effort to conceal his identity.

- In both attacks, the female victim was assaulted while at work or while leaving work.

- Both victims described their assailant as a Caucasian male with brown (Reedy) or light brown hair (Landmark), wearing blue jeans.

- Both victims described their assailant as being around the same age. The Landmark victim described her assailant as in his late-30s while Reedy described her assailant as in his mid-30s to early 40s.

- In both attacks, the assailant used a black handgun.

- Both victims were robbed, in addition to being sexually assaulted.

- Both victims were ordered to bare their breasts and had their breasts fondled by the assailant.

17

- Both victims were forced to perform oral sex upon the assailant.

H.  *The Affidavit*

In January 2005, six months after Reedy had reported the assault, and three months after the Landmark attack, Evanson began drafting the Affidavit he would submit with the criminal complaint against Reedy. Evanson sent an initial version of the Affidavit to William Fullerton, an Assistant District Attorney for Butler County, Pennsylvania. Fullerton reviewed the draft and advised Evanson that it was inadequate. Specifically, on January 11, 2005, Fullerton sent the following email to Evanson:

> I got your PC [probable cause Affidavit] and [police] report. I did not know they would be virtually identical. ... I dont [sic] have the time to edit and re-write the whole thing. If you want to re-draft the PC and include a description of the evidence that makes out the elements, I would be glad to review that. My thinking is that the PC needs to set forth that a report of a crime was made and what information you have, in brief, [that] shows that the event reported did not occur.

(App. at 725.) Fullerton confirmed in his deposition that he sent an email to Evanson encouraging Evanson to "explain the elements, [and] why [he] th[ought] the crime [was] there." (*Id.* at 703.) Although Fullerton expected to see another draft of the Affidavit, Evanson never sent a revised draft to him.

18

On January 14, 2005, Evanson learned from the Pennsylvania State Police that DNA analysis linked the Landmark attack to other sexual assaults in Pennsylvania. That same day, Evanson sent a copy of his police report about the Landmark attack to another town's police department via fax, with the subject line "Serial Rapist." (App. at 609.)     Also on that same day – six months after Reedy was attacked, five months after Evanson's investigative efforts had ceased, and three months after the Landmark attack –  Evanson filed the criminal complaint and Affidavit against Reedy with a Pennsylvania Magisterial District Judge. Assistant District Attorney Fullerton did not see the final Affidavit until after Evanson had filed it, and the only changes Evanson had made to the Affidavit from the draft that was earlier sent to Fullerton involved removing portions from the prior draft.

Later that month or early in February, Evanson gave details about the Reedy attack during a teleconference conducted by a State Police task force organized to catch the serial rapist.[15] Evanson also sent a copy of the police reports on the Reedy incident and on the later Landmark incident to Corporal George Cronin, the State Police officer in charge of the serial rapist task force.

---

[15]It is not clear exactly when in January or early February the teleconference occurred. It was, however, apparently after January 14, 2005 because Evanson stated in his deposition that charges had already been filed against Reedy at that point.

I.     *Reedy's Arrest and Subsequent Developments*

Reedy was notified of the warrant for her arrest and, on January 19, 2005, turned herself in. She was unable to post bond and was taken into custody and transported to the Butler County jail, where she spent five days awaiting a bail reduction hearing. Later, in February, Reedy called a State Police tip line that had been set up to obtain information about the serial rapist. She explained that she had been sexually assaulted but had been criminally charged for reporting the assault. On May 9, 2005, while charges were still pending against Reedy, Evanson was advised by the State Police that Reedy had contacted the task force tip line about the assault at the Gulf Station.

Reedy's criminal trial was scheduled to begin on September 19, 2005. On August 22, 2005, Wilbur Brown was apprehended while he was assaulting a female convenience store clerk in Brookville, Pennsylvania. Brown subsequently confessed to both the attack on Reedy and the Landmark attack. On September 1, 2005, the Butler County District Attorney dropped all charges against Reedy.

J.     *Procedural History*

On August 14, 2006, Reedy filed the present suit against Evanson, Meyer, Steve Mannell (the Public Safety Director for Cranberry Township), Butler County, Assistant District Attorney Fullerton, and Timothy F. McCune, the Butler County District Attorney. On March 12, 2008, after Butler County, Fullerton, and McCune were dismissed from the suit, Reedy filed an

amended complaint[16] against Evanson, Meyer, and Mannell, containing the following counts:

> Count 1: Unlawful search in violation of the Fourth Amendment, based on the toxicology screening performed on Reedy's blood;

> Counts 2, 3, and 4: Unlawful seizure, false imprisonment, and malicious prosecution in violation of the Fourth Amendment, based on Reedy's arrest;

> Count 5: Harm to liberty interest in violation of the Due Process Clause of the Fourteenth Amendment;[17]

---

[16]For simplicity, we refer to the amended complaint as the "complaint."

[17]Neither the District Court nor the parties have discussed Reedy's Fourteenth Amendment claim (Count 5). Either Count 5 has been abandoned, or, despite the fact that Count 5 is against one additional party as compared to Counts 2-4, they have treated Count 5 as being subsumed into Reedy's Fourth Amendment unlawful seizure claims. *Cf. Graham v. Connor*, 490 U.S. 386, 388 (1989) (holding that a Fourth Amendment claim of excessive force is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard"). Given the handling

21

Counts 6 and 7: State law claims of false arrest, false imprisonment, and abuse of process;

Count 8: A state law claim of intentional infliction of emotional distress[18]

On July 1, 2008, all of the defendants filed a motion for summary judgment. On March 31, 2009, the District Court granted the motion for summary judgment and entered final judgment in favor of the defendants and against Reedy on all counts.[19] However, the Court first held that, when the evidence was viewed in the light most favorable to Reedy, there was sufficient evidence to establish that Evanson knowingly or recklessly included false statements in, and omitted relevant information from, the Affidavit he had filed in support of Reedy's arrest.[20] The Court thus had to "excise the offending inaccuracies and insert the facts recklessly omitted [to]

of Count 5 by the parties and the District Court, we too decline to address that Count as an independent claim.

[18]Counts 1-4 were brought against Evanson and Mannell; Count 5 was brought against Evanson, Mannell, and Meyer; Counts 6 and 7 were brought against Evanson only; and Count 8 was brought against Evanson and Meyer.

[19]The District Court's opinion was not filed until April 20, 2009.

[20]These omissions and false statements are discussed more thoroughly below. *See infra*, Section III.A.ii.

determine whether or not the corrected ... affidavit would establish probable cause." (App. at 27 (quotations omitted).) After "[p]erforming such surgery," the Court held that the Affidavit as corrected, "provides probable cause to believe ... [that Reedy] committed the crimes ... ." (*Id.* at 27, 34.) The Court further held that, even if a genuine issue of fact existed as to whether the corrected Affidavit establishes probable cause, Evanson was entitled to qualified immunity because "a jury could not conclude that no reasonabl[y] competent officer would fin[d] probable cause in this instance." (*Id.* at 39-40.) The Court therefore granted Evanson summary judgment on Reedy's unlawful seizure claims.

Next, the District Court rejected Reedy's claim that her blood had been unlawfully searched, holding that, by signing two consent forms in connection with the rape examination at the hospital, she had consented to the testing of her blood for drugs. Alternatively, the Court determined that Reedy had "lost any reasonable expectation of privacy in that blood" once it was removed from her body. (*Id.* at 42.) The Court next held that Reedy had failed to produce sufficient evidence that Meyer and Mannell actively participated in any violation of her constitutional rights and that those defendants were accordingly entitled to summary judgment on all claims. Finally, the Court granted summary judgment to Evanson on Reedy's emotional distress claim, concluding that Evanson's conduct was not sufficiently "extreme and outrageous" to be a foundation for such a claim. (*Id.* at 43.) Having lost on all her claims, Reedy filed a timely notice of appeal.

## II.   Standard of Review [1][2]

A district court's grant of summary judgment is subject to plenary review.  *Horn v. Thoratec Corp.*, 376 F.3d 163, 165 (3d Cir. 2004).  Summary judgment is only proper when there is no genuine issue of material fact in the case and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c)(2).  Our role in reviewing a grant of summary judgment is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party."  *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009).  If so, summary judgment cannot stand.  We must view all of the facts in the light most favorable to the non-moving party, who is "entitled to every reasonable inference that can be drawn from the record." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000).  "[W]hen there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties."  *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982).

---

[21]The District Court had jurisdiction over Reedy's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.  The District Court had supplemental jurisdiction over Reedy's state law claims pursuant to 28 U.S.C. § 1367.  We have jurisdiction over this appeal under 28 U.S.C. § 1291.

## III. Discussion

Reedy raises several contentions on appeal. First, she argues that the District Court improperly granted summary judgment as to her unlawful seizure claim because, whether Evanson's Affidavit is analyzed on its face or after being corrected for omissions and false statements, there was no probable cause to arrest her. Reedy further argues that the District Court erred in holding that Evanson was entitled to qualified immunity. She says that immunity is not warranted because, viewing all the facts in the light most favorable to her, a reasonably competent officer would realize that there was no probable cause to arrest her. Second, Reedy argues that the District Court erred in holding that the toxicology screening of her blood for drug usage was within the scope of the two consent forms she signed as part of her rape kit examination. The District Court further erred, she says, when it held that she had no reasonable expectation of privacy regarding the testing of her blood simply because the blood had already left her body. Reedy further contends that the Court erred in dismissing her claims against Meyer and Mannell because the record contains sufficient evidence to support a claim that they violated her constitutional rights, namely, that they were active participants in arresting her without probable cause. Finally, she says the Court erred in granting summary judgment to Evanson on her emotional distress claim because his conduct qualifies as extreme and outrageous. We address each of these contentions in turn.

A.    *Unlawful Seizure: Probable Cause and Qualified Immunity*[22]

The Fourth Amendment provides that people are "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, ... and no Warrants shall issue, but upon probable cause ... ."  U.S. CONST. amend. IV. It is well-established that the Fourth Amendment "prohibits a police officer from arresting a citizen except upon probable cause."  *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995) (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 169 (1972)).

Probable cause "requires more than mere suspicion[.]" *Orsatti*, 71 F.3d at 482.  However, it does not "require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972).  Rather, "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  *Orsatti*, 71 F.3d at 483; *see also Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000)

---

[22]Our analysis of "unlawful seizure" (Count 2) encompasses Reedy's claims of false imprisonment and malicious prosecution (Counts 3 and 4), as well as her related state law claims of false arrest, false imprisonment, and abuse of process (Counts 6 and 7), because all of those claims turn on whether probable cause existed for the arrest.

("Probable cause exists if there is a 'fair probability' that the person committed the crime at issue." (citation omitted).). "Probable cause need only exist as to [one of the] offense[s] that could be charged under the circumstances." *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994). In analyzing whether probable cause existed for an arrest, we must take a "totality-of-the-circumstances approach." *Illinois v. Gates*, 462 U.S. 213, 230 (1983).

i. *The Original Affidavit*

Taken on its face, Evanson's original Affidavit accused Reedy of false reporting, theft, and receiving stolen property[23] based on the following assertions of fact, some of which have been contradicted by Reedy and some of which were later corrected by the District Court:

---

[23] The Pennsylvania Crimes Code (the "Code") states that a person commits the crime of false reporting if he "reports to law enforcement authorities an offense or other incident within their concern knowing that it did not occur[.]" 18 PA. CONS. STAT. § 4906(b)(1). With respect to theft, the Code states that "[a] person is guilty of theft if he unlawfully takes, or exercises unlawful control over, moveable property of another with intent to deprive him thereof." *Id.* § 3921(a). A person commits the crime of receiving stolen property "if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner." *Id.* § 3925(a).

27

(1) On July 14, 2004, Reedy reported to Robert McGee, an employee at the service station next door to the Gulf Station, that she had been sexually assaulted and robbed by an unknown assailant.

(2) Reedy provided McGee with a description of her assailant, but was unsure of the direction he went when he left the store and could not provide a description of any vehicle he may have used.

(3) Reedy provided Mascellino and Evanson with a description of the robbery, which she said occurred at 10:40 pm.

(4) Evanson attempted to contact Reedy on July 15, 2004, and was unable to reach her for several days.

(5) Evanson spoke with Hazlett and learned that the power for the store's alarm system was interrupted on the night of the robbery and alleged assault and that the company monitoring the security system had unsuccessfully attempted to contact the store.

(6) Hazlett returned to the store after the incident and found that the power cord for the alarm system had been unplugged.

28

(7)     Reedy's statement regarding the assailant pressing the "no sale" key on the cash register matched the exact time indicated on the register tape.

(8)     $606.73 was taken from the store's cash register during the robbery.

(9)     On July 23, 2004, Evanson met with Reedy and her mother. He asked Reedy if her assailant had disabled, or had ordered her to disable, any wires other than the telephone lines during the attack. Reedy responded that he had not. Evanson also specifically asked Reedy if her assailant disabled any lines for the electricity or the alarm, to which Reedy responded no.

(10)    When Evanson told Reedy that the security system company had reported that the security system's power failed at 10:14 p.m., Reedy stated that she did not know how that occurred.

(11)    When Evanson told Reedy that a power cord for the security system was unplugged in the back room, and questioned Reedy about how that could have happened, Reedy became verbally abusive and stated, "I just want to drop the whole thing."

(12)     When Evanson told Reedy that the matter could not be dropped, Reedy said, "I just want this whole thing to go away."

(13)     Meyer learned that in mid-July, Watt and Reedy looked into renting a mobile home with a monthly rental fee of $365.00 and a security deposit of that same amount.

(14)     On July 19, 2004, Watt and Reedy in fact applied to rent a mobile home. Catholic Charities indicated that it would pay $200.00 of the security deposit and that Watt and Reedy would pay the remaining $165.00. On July 20, 2004, Watt paid the remaining $165.00 of the security deposit in cash.

ii.     *The Corrected Affidavit*

Reedy argued before the District Court that the Affidavit not only lacked probable cause on its face, but that it contained material falsehoods and omissions. An arrest warrant "does not, in itself, shelter an officer from liability for false arrest." *Wilson*, 212 F.3d at 786. Instead,

> a plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the

evidence: (1) that the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause.

*Id.* at 786-87 (internal quotations omitted). Thus, a court faced with a claim that an arrest warrant contains false assertions and omissions must first determine whether the officer made those false assertions or omissions either deliberately or with reckless disregard for their truth.

Whether something is done deliberately is a straightforward question of fact. To know whether something is done with "reckless disregard" for the truth requires some explanation of the meaning of that term. Assertions are made with reckless disregard when, "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Id.* at 788 (internal quotations omitted). Assertions can be made with reckless disregard for the truth "even if they involve minor details – recklessness is measured not by the relevance of the information, but the demonstration of willingness to affirmatively distort truth." *Id.* "[O]missions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know" in making a probable cause determination. *Id.* at 783.

After establishing that "there [is] sufficient evidence of omissions and assertions made knowingly, or with reckless disregard for the truth," a court "assess[es] whether the statements and omissions made with reckless disregard of the truth were material, or necessary, to the finding of probable cause." *Id.* at 789 (internal quotations omitted). "To determine the materiality of the misstatements and omissions," a court must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether ... the 'corrected' ... affidavit would establish probable cause." *Id.*

This two-part exercise – determining the affiant's motivation and constructing a revised Affidavit without material omissions or misstatements – ensures that a police officer does not "make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence." *Id.* at 787. We have cautioned that "[a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Id.* at 790 (internal quotations omitted).

The District Court agreed with Reedy that, viewing the evidence in the light most favorable to her, a jury could conclude that the Affidavit suffered from recklessly-made false statements and omissions.[24]  Specifically, the District Court

---

[24]Evanson does not directly challenge the District Court's findings of false statements and omissions in the Affidavit.

Rather, he argues that the Affidavit he originally submitted, as well as the revised Affidavit, both "present probable cause." (Appellees' Answering Br. at 29-30.) We note, however, that the District Court wrongly applied the summary judgment lens of "all inferences in favor of the non-moving party" to the analytical steps we outlined in *Wilson*. We did not say in *Wilson* that the question of whether an affidavit has material omissions and misstatements should be viewed from the deliberately slanted perspective that summary judgment demands. On the contrary, the necessary import of *Wilson* is that the effort to determine whether an affidavit is false or misleading must be undertaken with scrupulous neutrality. *See Wilson*, 212 F.3d at 787 (citing criminal cases *United States v. Leon*, 468 U.S. 897 (1984), and *Franks v. Delaware*, 438 U.S. 154 (1978), in support of the proposition that a court testing probable cause for an arrest challenged in a § 1983 case "must first consider whether [the plaintiff] adduced sufficient evidence that a reasonable jury could conclude that [defendant police officer] made statements or omissions that he 'knew [were] false, or would have known [were] false except for his reckless disregard for the truth.'").

Specifically, *Wilson* provides that the person challenging the affidavit must show, by a preponderance of the evidence, that "(1) that the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." *Wilson*, 212 F.3d at 786-87 (internal quotations omitted). Once that review and correction

33

reached the following conclusions:

> (1)    Evanson omitted, with reckless disregard for the truth, that he spoke with Reedy's mother on July 15, 2004, the day after the incident, and that Reedy's mother made arrangements for Reedy to travel to the police station the next day, on July 16, 2004. He also omitted the fact that Reedy did indeed meet with him at the station on July 16, 2004, as planned. Evanson had stated in the original Affidavit that he attempted to make contact with Reedy for several days after the incident but that she would not return his calls. He had also

---

process is complete, the corrected affidavit (assuming there were corrections to be made) simply becomes one more set of factual assertions that must then be viewed in the light most favorable to the non-movant, in the same manner as all of the other evidence is to be considered at the summary judgment stage. The existence of a factual assertion in the corrected affidavit of course does not preclude other evidence pertaining to the same topic covered by that assertion from also being considered in the summary judgment process.

Our review of the record here has not been affected by the District Court's error in this regard. Having examined the totality of the circumstances, including the glaring omissions in Evanson's affidavit, we have reached the conclusions we describe.

34

stated in the original Affidavit that his meeting with Reedy and her mother occurred eight days after Reedy was released from the hospital, on July 23, 2004. The Affidavit was corrected to reflect that Evanson spoke with Reedy's mother the day after the incident, and that Reedy and her mother met with him that following day, July 16, 2004.

(2) Evanson recklessly misrepresented the purpose of that meeting with Reedy at the police station, neglecting to include the fact that he also wanted to discuss the possibility that Reedy had fabricated the entire incident. Evanson had stated in the original Affidavit that the purpose of the meeting was simply to discuss the alleged assault and robbery. The Affidavit was corrected to reflect that Evanson also wanted Reedy to come to the police station to discuss the possibility that she had committed theft and concocted the rape allegations to cover her crime.

(3) Evanson recklessly mischaracterized Reedy's reaction to his questioning as "verbally abusive" rather than being simply upset. The Affidavit was corrected to reflect that Reedy became "upset" at

Evanson's line of questioning. (App. at 23.)

(4)  Evanson recklessly omitted the fact that the two accounts Reedy provided to Mascellino and Farah about the attack were consistent with one another and were given in graphic detail. The Affidavit was corrected to fill in that omission.

(5)  Evanson recklessly omitted the fact that the Gulf Station's panic alarm would have worked had Reedy attempted to use it, but that she may have been too distraught to use it since a gun was pointed at her at the time. The Affidavit was corrected to include that information.[25]

(6)  Evanson recklessly stated that Reedy described her assailant as between 28 and 31 years of age. Reedy, however, testified that she had described her assailant as in

_____

[25] Evanson had not included a statement about the existence of a panic alarm in his original Affidavit. He explained in his deposition that he considered Reedy's failure to press the panic alarm during the incident to be irrelevant, because it might have been due to the fact that the assailant was pointing a gun at her at the time, and thus, she might have been too distraught to reach for it.

his mid-30s to early 40s, a description confirmed by the fact that she told Farah that her assailant was in his mid-30s to 40s. The Affidavit was corrected to include the latter characterization of the assailant's age.

(7)     Evanson recklessly stated that Hazlett left the Gulf Station at 9:15 p.m. on the day of the incident, rather than 3:00 p.m., the time that Hazlett stated she left. The Affidavit was corrected to reflect that Hazlett left the store at 3:00 p.m.

(8)     Evanson recklessly omitted the fact that he had investigated the Landmark Attack during the time he was investigating Reedy's attack. The Affidavit was corrected to include the fact that Evanson investigated a robbery and sexual assault with "several similarities" to Reedy's attack. (*Id.* at 27.)

The District Court reconstructed the Affidavit based on those several conclusions. It then weighed what it considered to be exculpatory facts in the revised Affidavit against what it considered to be inculpatory facts, and held that the Affidavit, even as corrected, still established probable cause to arrest Reedy for false reporting and theft.

iii.   *Probable Cause Analysis*

The District Court's approach was correct, but we cannot agree with its ultimate conclusion about probable cause. In general, the District Court committed four types of error. First, it erred in its reconstruction of the Affidavit because it failed to consistently interpret the record in the light most favorable to Reedy and instead, contrary to the summary judgment standard, occasionally adopted interpretations that were the least favorable to Reedy. Second, the Court cited several inculpatory "facts" to support probable cause that were not actually supported by the record. Similarly, not all of Evanson's arguably reckless omissions were actually included in the Court's reconstructed Affidavit and analysis. Third, the Court erred in deciding that certain facts were inculpatory when they were either irrelevant or even exculpatory. Finally, the Court erred when it gave little weight to the highly significant exculpatory facts that the Landmark attack, with all of its similarities to the attack on Reedy, occurred before Evanson sought to arrest Reedy and that Evanson was responsible for investigating both attacks. We explain below how these general errors manifested themselves more specifically, and why the reconstructed Affidavit, as further corrected by us, fails to establish probable cause.

1.   Reedy's Supposed Reluctance to be Available and Evanson's Predisposition Toward Reedy

The District Court first cited as inculpatory the fact that Reedy "was unwilling to provide a firm commitment to meet with the police ... on the night in question and did not make

38

herself available until Detective Evanson continued to press the matter with [Reedy's] parents." (App. at 31.)  The Court then held that, "although [Reedy] and her parents did actually meet with Detective Evanson" the day after Reedy was released from the hospital, that fact only "weaken[s] the inferences that [Reedy] was evasive and uncooperative." (*Id.* at 31-32.)  Thus, the Court held that "[t]he inference of reluctance to be available to the police was fairly raised by [Reedy's] behavior." (*Id.* at 31.)

The record, however, if viewed in the light most favorable to Reedy, does not show any lack of willingness by her to meet with the police.  On the night of the attack, she immediately sought help to report it.  She then, over the course of the night, provided three separate, consistent, and detailed accounts of the traumatic incident.  Two of those statements were to police officers.  She also agreed to take a polygraph test.  The day she was released from the hospital, the earliest day she could physically travel to the police station, she and her parents met with Evanson at the station and she provided a detailed written statement that was consistent with the accounts she had given at the hospital.  These are not the actions of someone trying to avoid cooperating with the police.

The Court also cited as inculpatory the fact that, when Evanson tried to contact Reedy on July 15, he was only able to reach her voicemail.  On July 15, however, Reedy was still in the hospital, and Reedy's mother contacted Evanson that same day on Reedy's behalf and arranged for Reedy to go to the police station the next day. Reaching the voicemail of a person who has just been sexually assaulted at gunpoint, while that

victim is still in the hospital, does not demonstrate that the victim is uncooperative, especially when the victim has a relative return the phone call the same day.

Moreover, even if Reedy had shown a reluctance to cooperate, a reasonable jury could find that such reluctance was not inculpatory but was understandable in the face of Evanson's undisguised suspicion of Reedy from practically the moment she reported the attack. The District Court correctly recognized the remarkable rapidity with which Evanson viewed Reedy as the prime suspect in the theft of the Gulf Station, but the Court nevertheless expressly declined to consider Evanson's predisposition toward Reedy to be relevant, stating that "whether Detective Evanson had a predisposition towards [Reedy] ... from the start of [the] investigation does not change the inculpatory information … ." (*Id.* at 31.) That puzzling assertion ignores the human dynamic inherent in communication. Evanson's predisposition, which was manifested in his aggressive and insulting accusations, is certainly relevant to an interpretation of Reedy's attitude, because her actions or statements occurred in the context of, and in response to, Evanson's actions and statements. Reedy's behavior cannot be fairly analyzed without considering the behavior of Evanson to which she was reacting.

Evanson's investigation into the reported rape and robbery appears to have focused exclusively on the theory that Reedy was a liar and thief. The police report – and, for that matter, the entire record – indicates that, after a brief search of the woods on the night of the incident, Evanson and the other officers made no effort to locate Reedy's assailant or to consider

40

anyone but Reedy and Watt as suspects, even after the Landmark Attack.[26]  As Reedy tells it, the night she was attacked, while she was still in the hospital and after she had given Evanson a detailed description of the events that matched what she had already told Mascellino, and before Evanson had done any further investigation, he called her a liar and repeatedly accused her of stealing the money from the store.

In short, we are mindful that we must view the record in the light most favorable to Reedy.  The fact that Reedy reported the assault immediately, provided three consistent and detailed accounts of it,[27] traveled to meet with Evanson the day after she was released from the hospital, provided another detailed statement in writing, and did all of this in the face of Evanson's repeated accusations against her, shows a willingness to work with law enforcement rather than an "evasive" or

---

[26]*See infra*, Section III.iii.7.

[27]The District Court corrected Evanson's original Affidavit to reflect that Reedy had provided two separate detailed accounts of the assault to Mascellino and Farah, and that those accounts were consistent with one another.  The Court cited that as exculpatory.  We agree it is exculpatory, but note that the record actually reflects that Reedy provided three graphic accounts of the assault on the night of the incident – to Mascellino, Farah, and Evanson – and that all three accounts were consistent with one another.  Accordingly, in reconstructing the Affidavit and analyzing it for probable cause, the District Court should have included and considered all three accounts.

41

"uncooperative" attitude. Accordingly, the District Court's characterization of Reedy's behavior as inculpatory is clearly wrong.

        2.    <u>The Cash Register and the Assailant's Exit</u>

The District Court regarded as inculpatory Reedy's failure to provide any information about how her assailant arrived at the gas station or in what direction he went when he left the scene. At the same time, however, the District Court found Reedy's knowledge about the precise time the cash register was opened to be inculpatory, because it seemed suspicious to the Court that she could remember such detail. The District Court thus placed Reedy in a memory trap: she implicated herself by noticing and remembering certain details about the attack, but also implicated herself by not noticing or remembering other details. Leaving aside the fact that a reasonable jury could conclude that people often remember some details but not others, the District Court's conclusion is inapposite because, again, it casts the evidence in an unfavorable light for Reedy. It does not take much generosity to consider that Reedy may have been unaware of her attacker until he was already in the store. Hence, not knowing the direction he came from is hardly inculpatory. Reedy could not describe the direction that her assailant left the scene because she remained in the backroom of the station at the time he left, just as he had ordered. If the evidence is viewed in her favor, these interpretations must be given their due and the inculpatory conclusion reached by the District Court falls away.

### 3.     The Panic Alarm and Counseling

The District Court thought it inculpatory that Reedy had failed to push the panic alarm while a gun was being pointed at her,[28] and that she had declined professional counseling when it was offered to her. Specifically, the Court held that Reedy's

> declining professional counseling after it was offered repeatedly and the fact that she did not attempt to press the panic alarm at any time during the events happening behind the counter in the front room, while susceptible of innocent explanation, add to the quantum of information supporting a finding of probable cause.

(App. at 34 n.7.)

Here again, the District Court erred in its application of the summary judgment standard. It explicitly recognized that there are two reasonable interpretations of Reedy's conduct, stating that Reedy's conduct is "susceptible of innocent explanation." (*Id.*) However, it then adopted the least favorable interpretation for Reedy, which is contrary to the requirement that "[t]he evidence of the non-movant is to be believed, and all

---

[28]Evanson's police report states that the perpetrator "pulled a black semi-automatic handgun from the waist band of his pants and proceeded to point said gun at victim." (App. at 350.) Reedy said that he "pointed his gun at the left side of [her] head." (*Id.* at 460-61.)

43

justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

More specifically, the District Court's implication that there is a duty to attend counseling is incorrect. There is no such duty. Moreover, implicit in the Court's conclusion that an inculpatory inference can be drawn from Reedy's decision not to attend counseling is a value judgment about how victims ought to respond to trauma. That is a highly debatable judgment, lacking any foundation in the record. Even if there were some basis for saying that refusing counseling is inculpatory, Reedy explained why she did not want counseling, saying that her earlier experience with sexual abuse would allow her to handle the trauma. When confronted, as the District Court evidently believed it was, with two explanations for Reedy's decision to refuse counseling – either she was lying about the assault or she believed counseling was not necessary – the Court chose to operate on the least favorable interpretation of the evidence. That was error. Likewise, Reedy's failure to reach for a panic alarm when a gun was pointed at her and she was being sexually assaulted, which are the facts we must accept at this stage, is not in the least inculpatory.[29]

---

[29]The District Court's statement about the panic alarm is also troubling because it is based on the assumption that a victim must engage in active forms of resistance during a sexual assault, even if that resistance threatens personal safety. *See State ex rel. M.T.S.*, 609 A.2d 1266, 1271 (N.J. 1992) (discussing how historically "[c]ourts assumed that any woman who was [sexually assaulted] necessarily would resist to the extent of her ability"). Under Pennsylvania law, to which

### 4. The Security Alarm System

The District Court focused heavily on events related to the security alarm system. Of the several assertions of fact cited by the Court as inculpatory, the following five involved the security alarm system:

(1) the power to the alarm system was disabled approximately 20 minutes before the attack;

(2) the system had been unplugged from its socket behind a desk in the Gulf Station's rear office;

(3) Reedy stated that her attacker was not in the area where the plug to the alarm system was located;

(4) Reedy admitted that her attacker did not disable any lines for electricity or the alarm system, and;

---

Evanson was presumably looking in drafting his Affidavit, that assumption is not legally permissible, because, in 1976, the Commonwealth enacted a statute stating that a sexual assault victim's lack of resistance is not relevant. *See* 18 PA. CONS. STAT. § 3107. By the District Court's reasoning, however, it was appropriate for Evanson to presume that Reedy was lying because she did not press a panic alarm while a man pointed a gun at her and sexually assaulted her. That reasoning amounts to a return to considering a victim's lack of physical resistance to be legally significant.

(5) when asked about the alarm system and why the power would have gone out twenty minutes before the attack, Reedy became upset and stated that she wanted the whole thing to go away.

The Court drew these assertions of fact from Evanson's reply brief in support of summary judgment, despite that brief's failure to contain any citations to the record. The record actually does not align with Evanson's assertions or with the description provided by the District Court on the last three of those five points. As to the third point, Reedy's assailant forced her into the back room where he ordered her to disable the telephone lines. Thus, the assailant was in fact in the area where the plug to the alarm system was located, and Reedy never stated otherwise. As to the fourth, Reedy never admitted that her attacker did not disable the alarm system; rather, she told Evanson that she did not know how the power to the alarm system was disabled. As to the fifth, Reedy's statements – "I just want this whole thing to go away" and "I just want to drop the whole thing" – were made while she was being accused by Evanson of being a liar and a thief. The District Court's discussion of these statements as inculpatory assumes that a jury could draw only one conclusion from Reedy's statements: that Reedy had a guilty conscience about the matter. But contrary to that, a reasonable jury could plausibly conclude that, at the time Reedy made those statements, she could tell that Evanson was going to make her life unpleasant and so she naturally "wanted this whole thing to go away." (App. at 198 ¶ 48.) This again reflects a failure to "construe[ the evidence] in the light most favorable to the party opposing summary judgment." *Anderson*, 477 U.S. at 261 n.2. In short, points 3, 4, and 5 on the list of

46

factual assertions regarding the alarm system are not supported by an appropriate view of the record.[30]

### 5.  The Remaining Inculpatory Facts

The District Court noted other facts that it considered to be inculpatory but which bear innocent explanation.  First, the Court pointed out that Reedy was the sole employee on the premises when the incident occurred.   While perhaps inculpatory in the sense that Reedy had an opportunity to commit the crime, her being alone is also consistent with her

---

[30]Moreover, as Reedy notes, if she had intended to disable the power to the alarm to support a fabricated story of rape and robbery, she could have done at least one of the following:

> (1) blamed her assailant for disabling the alarm, especially in response to Evanson's questions about the alarm; (2) reported the attack to have occurred at about the same time as the disabling of the alarm; and/or (3) reported to the police that she was unable to use the alarm/panic button because it had been disabled.

 (Appellant's Opening Br. at 41.)  That she did none of these things arguably cuts against the view that she fabricated her story.  On this record, although Reedy has not proffered an explanation for how the alarm system was disabled, a reasonable jury could conclude  that she was genuinely unaware of what had occurred with the system.

being a victim of assault, as a jury could conclude that an assailant would chose to rob a gas station convenience store relatively late at night precisely because he might assume it would be staffed by a single employee.

Second, the Court noted that Watt arrived at the scene shortly after the incident was reported and later had cash for a deposit of $165.00 for the rental of a mobile home, just a few days after the incident. The implication is that Reedy had arranged for Watt to arrive at the Gulf Station as part of a scheme to transfer the stolen cash to him. But Watt arrived at the scene after the police were already there, and, according to Reedy, in response to her urgent call. Moreover, she stated that Watt typically picked her up after her shift ended and so he would have arrived at the scene near that time anyway, since the incident occurred when Reedy's shift was ending. We also cannot agree with the District Court that making a $165.00 deposit is necessarily inculpatory. Even assuming that Reedy had no money for the rental deposit, the record is silent about Watt's financial status and whether he had legitimate access to funds for the deposit. In short, without more facts – and, particularly at the summary judgment stage, where the only permissible inferences are ones in favor of Reedy – Watt's and Reedy's payment of $165.00 has little, if any, inculpatory value.[31]

---

[31]Hazlett stated in her deposition that a week prior to the incident, Reedy told her that she and Watt needed a $600.00 down payment for a trailer that they wanted to purchase. However, because Hazlett did not reveal this information until her deposition, no reference to this fact is contained in the police

6.      The Drug Testing

Evanson's briefing before us emphasizes that Reedy had used drugs and claims that her "lying about her use of marijuana and diazepam justified [his] suspicion and reinforced the theory that [Reedy] was involved in the removal of the money." (Appellees' Answering Br. at 37.)  However, Evanson did not include in his original Affidavit any reference to Reedy's use of marijuana or other drugs, or to her alleged lying about drugs, suggesting that, despite his present rationalization, he did not believe that the information was relevant to probable cause.

Moreover, at least as to her marijuana use, Reedy appears to have been forthcoming to both Evanson and Farah, acknowledging that she had used marijuana several days before the incident.  Evanson has failed to explain how a positive urine test for marijuana is inconsistent with Reedy's statement of when she had used marijuana, and, thus, he has not explained why marijuana testing led him to question Reedy's credibility.  To the extent he is implying that marijuana could only be detected by the test if the use had been more recent, Evanson has referenced nothing to support that conclusion.

As to the diazepam, the evidence of Reedy's denying drug use is more equivocal. Evanson says that, when he asked Reedy if she had consumed any narcotics, she answered that she had not, but that later he discovered she had taken a diazepam. According to Evanson, this demonstrates that Reedy had lied to

report or the Affidavit, and it played no part in Evanson's probable cause analysis.

49

him. That, of course, assumes that Reedy understood the word "narcotic" to include diazepam. Evanson also says that when he asked Reedy about her marijuana consumption, she responded that, while she had smoked marijuana, she had taken no other medication. If Reedy made the statement that she had taken no other medication, that could surely be viewed as inconsistent with her admission that she had taken a diazepam. However, there is a question about whether Evanson's account of the conversation is accurate, because of evidence that indicates that it was inserted into the police report after the fact.[32] More importantly, it bears re-emphasis that the issue of Reedy's drug use was evidently not a part of Evanson's probable cause

---

[32]The only evidence of this conversation between Evanson and Reedy is found in Evanson's police report entries. The police report indicates that this information was entered by Evanson on July 15, 2004, the day after the incident. However, according to Reedy, defendants produced electronic backup files of the police report, which revealed that Evanson's question to Reedy about narcotics usage was inserted into the police report on September 1, 2004. By September 1, 2004, Evanson had obtained the results of the toxicology report and had confronted Reedy with those results. Reedy says she explained to Evanson that Watt had given her diazepam to relax after the assault. Reedy thus suggests that, since Evanson "was aware of Reedy's truthful and eminently reasonable explanation" for both the diazepam and the marijuana, Evanson knew that he could only suggest Reedy was untruthful if he "specifically referred to the use of prescription or non-prescription drugs ... ." (Appellant's Reply Br. at 12.)

50

determination, because he did not mention Reedy's drug use in the Affidavit.

### 7.      The Landmark Attack

Prominent among the problems with the District Court's probable cause analysis is the way that it addressed the Landmark attack. While recognizing that Evanson's failure to include any mention of that attack in the Affidavit was a reckless omission, the Court nevertheless concluded that, while the Reedy and Landmark attacks "share general similarities[,] ... [s]uch details neither add to nor subtract from the probable cause determination." (App. at 26.) That conclusion is unsustainable because it ignores the marked similarities of the attacks and the fact that Reedy was charged with fabricating the entire incident at the Gulf Station.

The several similarities between the Landmark attack and the attack on Reedy constitute material omissions that should have been included by the District Court in the reconstructed Affidavit. Once included, they significantly undermine the conclusion that there was probable cause to arrest Reedy for theft, receiving of stolen property, and filing a false report.

Not only are the similarities between the attacks objectively apparent, the attacks may have been subjectively connected in Evanson's mind prior to the time he arrested Reedy. That is at least a fair inference when the record is viewed in Reedy's favor, though Evanson denies it. On October 13, 2004, approximately three months after the attack on Reedy, the Landmark victim reported being attacked by someone of the

51

same general description as Reedy's assailant, who used a similar weapon, and who forced her at gunpoint to allow him to fondle her breasts and to perform oral sex on him. The Landmark attack, which took place less than two miles from the Gulf Station and at practically the same time of night as Reedy's attack, was the only other reported sexual assault in Cranberry Township in 2004. It was also assigned to Evanson as the lead investigator. Nevertheless, when Evanson filed his Affidavit against Reedy on January 14, 2005, he did not mention the Landmark attack and there is no indication in the record that he investigated any relationship between the two incidents, or that he even considered the similarities between the two attacks. When Evanson was asked in his deposition, "[w]hat information would you have needed to link the Reedy rape and the Landmark rape?", he responded that the "only things that could have linked" the two incidents in his mind would have been a confession from the assailant or a DNA match.[33] (*Id.* at 219, p. 520.)

Regardless of the credibility of that claimed level of cluelessness, the record indicates that Evanson eventually did recognize the connection between the two attacks. On January 14, 2005, the same day that he filed the criminal complaint against Reedy, Evanson learned from the State Police that the Landmark attack was linked, by DNA, to other attacks

---

[33]Even on appeal, Evanson continues to say that he never once thought to connect the two crimes, because "[f]rom [his own] perspective ... only a confession or a DNA match would have linked the Landmark and the Reedy incidents." (Appellees' Opening Br. at 15.)

52

throughout Pennsylvania, and that those attacks were believed to have been committed by a serial rapist. Also that same day, Evanson sent a copy of the Landmark police report to another town's police department via fax, with the subject line "Serial Rapist." Soon thereafter, in late January or early February, Evanson gave details about the Reedy attack during a teleconference conducted by a State Police task force organized to catch that serial rapist. Finally, sometime later in February, Reedy contacted the State Police through a tip line established to obtain information regarding the serial rapist, and she advised them that she had been charged with making a false report. On May 9, 2005, while charges were still pending against Reedy, Evanson heard from the State Police that Reedy had contacted them on the rape tip line. Despite all this, the record does not reveal that Evanson ever reconsidered Reedy's arrest or made any effort to investigate whether the Landmark and Reedy attacks were related.[34]

Particularly telling as to probable cause is the deposition of Corporal George Cronin of the State Police, who led the statewide task force. After comparing the police reports in the Reedy attack and the Landmark attack, Cronin testified that the similarities between the two attacks "seemed to be fairly obvious," and he answered "yes" when asked whether he would

---

[34]We note these post-arrest events not because they figure into an analysis of probable cause at the time the arrest took place but because they may be seen as indicative of Evanson's closed mind throughout the entire set of events, if one views all of the evidence in Reedy's favor.

53

expect a detective who was investigating both crimes, as Evanson was, "to recognize those similarities." (App. at 626.)

The District Court minimized Cronin's testimony and the similarities between the attacks, saying that Evanson had no constitutional duty to further investigate in the hope of finding exculpatory evidence. Assuming that were true, it is beside the point. No further investigation was needed to reach the conclusions expressed by Cronin. All that was required was a simple comparison of the police reports in the two cases, both of which were written by Evanson. On the very day he filed the Affidavit, he participated in a discussion of the Landmark attack as the work of a serial rapist. Again taking the view of the record required at this stage, Evanson's failure or refusal to compare the two attacks he was investigating – stating that only a DNA match or a confession would link the two attacks – demonstrates that he chose to "disregard plainly exculpatory evidence," *Wilson*, 212 F.3d at 790, and that he created the "unnecessary danger of unlawful arrest," *Malley v. Briggs*, 475 U.S. 335, 345 (1986).

v.      *Probable Cause Conclusion*

In sum, within hours of the attack on Reedy, Evanson concluded that Reedy had fabricated the robbery and sexual assault. Three months later, another robbery and sexual assault occurred involving substantial similarities to the attack on Reedy. The later attack was identified as the work of a serial rapist. Despite that, Evanson declined to consider that the two attacks were linked. Six months after Reedy reported that she had been robbed and assaulted at the Gulf station, Evanson

54

arrested her on the same theory he had formed the night that he met her at the hospital. Taking all inferences in favor of Reedy, a reasonable jury could conclude that, at the time the arrest was made, the facts and circumstances within Evanson's knowledge were not sufficient "to warrant a prudent man in believing that [the suspect] had committed ... an offense." *See Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005) (first alteration in original) (internal quotations omitted).[35] Accordingly, on this record, viewed in Reedy's favor, it was error for the District

---

[35]Evanson attempts to analogize the present case to *Wright*, 409 F.3d at 595. However, *Wright* is significantly distinguishable. The plaintiff in *Wright*, after being sexually assaulted by two men, returned to the house where she was attacked and broke into that house to retrieve her belongings. *Id.* at 597. While there, she took other items that did not belong to her. *Id.* Wright was charged with burglary, theft, criminal trespass, and criminal mischief. *Id.* at 596. Those charges were later dropped for failure to prosecute. *Id.* at 598. Wright then filed a § 1983 claim for false arrest. *Id.* We held that the officers had probable cause to arrest Wright for criminal trespass on the basis that she admitted to the police that she had broken a window, entered the house, and removed items from the house. *Id.* at 603. Unlike Wright, who admitted to having committed elements of the crimes charged, Reedy has never admitted to any crime, but rather has argued consistently that, at the time of her arrest, there was no probable cause to believe that she committed any element of any of the offenses for which she was charged.

Court to hold that Evanson had probable cause to arrest Reedy.

### vi.  *Qualified Immunity*

The District Court held in the alternative that, even if there was no probable cause, Evanson is entitled to qualified immunity.  The burden of establishing entitlement to qualified immunity is on Evanson.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 808 (1982).  In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-part test to determine if a defendant can be shielded by qualified immunity.  First, we must ask whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right[.]"  *Id.* at 201.  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  *Id.*  If, however, the facts read in the light most favorable to the plaintiff show a violation of a constitutional right, as they do here because an arrest was made without probable cause, we must ask "whether the right was clearly established ... in light of the specific context of the case ... ."  *Id.*  A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[36]  *Id.* at 202.   A defendant police

---

[36]While *Saucier* mandated that a court must first determine whether a constitutional right had been violated before asking whether the right was clearly established (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted), the Supreme Court has recently

officer "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue ... ." *Malley*, 475 U.S. at 341.

For the reasons described above, it must be said that, viewing the evidence from Reedy's perspective, "no reasonably competent officer would have concluded that a warrant should issue" when it did for her arrest for making a false report of the rape, for theft, and for receiving stolen property.[37]  *See Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial

---

clarified that lower courts have discretion to determine the order of the qualified immunity analysis in order to avoid unnecessary analysis of challenging constitutional questions. *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

[37]Further, qualified immunity exists, in part, to protect police officers in situations where they are forced to make difficult, split-second decisions. *See Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir. 2005) ("Under qualified immunity, police officers are entitled to a certain amount of deference for decisions they make in the field [because they] must make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving." (internal quotations omitted)).  There were no "split-second" decisions made in this case.  The Reedy attack occurred on July 14, 2004, the Landmark attack occurred on October 13, 2004, and Evanson did not file the Affidavit against Reedy until January 14, 2005, five months after ceasing his investigative efforts into Reedy's case.

to the resolution of any assertion of qualified immunity is a careful examination of the record ... to establish, for purposes of summary judgment, a detailed factual description of the actions of each individual defendant viewed in a light most favorable to the plaintiff.") (internal punctuation omitted). The District Court thus erred in granting summary judgment on the basis of qualified immunity.[38]

### B.      *Unlawful Search:  The Blood Claim*

#### i.      *Background*

As earlier discussed, Evanson directed the hospital to perform drug testing on blood samples taken from Reedy as part of her rape kit examination. The test results, which Evanson obtained eight days later through a search warrant, revealed that Reedy had ingested diazepam and confirmed that she had used marijuana.

---

[38]Qualified immunity was discussed by the District Court only with respect to Reedy's § 1983 claims concerning her arrest (i.e., her claims of unlawful seizure, false imprisonment, and malicious prosecution). Our decision on qualified immunity as to those claims is solely that it is not warranted at the summary judgment stage in this case. Qualified immunity remains a viable defense, though its applicability cannot be finally determined until after the facts have been sorted out at trial. With respect to Reedy's other § 1983 claim – her unlawful search claim – we make no comment on the availability of qualified immunity as it may pertain to that claim.

Reedy contends that, under Fourth Amendment standards, Evanson conducted an unreasonable, warrantless search of her blood by ordering the drug screening.[39] Evanson does not argue that he had a warrant to search Reedy's blood, but rather argues that Reedy consented to the search, or alternatively, that she had no reasonable expectation of privacy in her blood because it had left her body. The District Court held that the Fourth Amendment's protections apply only to intrusions below the bodily surface, and that Reedy thus lost any reasonable expectation of privacy in her blood after she consented to having it drawn as part of her rape kit. The Court alternatively held that the drug screening Evanson ordered fell within the scope of the authorization form that Reedy had signed. On appeal, Reedy challenges both of those conclusions.

We address the consent issue before considering whether Reedy had a reasonable expectation of privacy in her blood, because, if Reedy consented to having her blood searched for drugs, there is no need to ask whether she had a reasonable expectation of privacy in the blood that was drawn.

_____

[39]No one appears to be disputing that Evanson had probable cause to believe that the blood would reveal that Reedy had used a controlled substance. Indeed, Reedy had admitted that she had smoked marijuana. Rather, the issue is that he conducted a warrantless search.

ii. *Consent*

The Fourth Amendment's protection proscribes only government action. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Although the medical personnel who drew and tested Reedy's blood are not government actors, because the personnel acted at Evanson's direction, they were effectively acting as agents of the government. *See Lustig v. United States*, 338 U.S. 74, 79 (1949), *overruled on other grounds by Elkins v. United States*, 364 U.S. 206 (1960) (indicating that evidence procured with the participation of government actors implicates the Fourth Amendment).

As a general matter, "warrantless searches ... are *per se* unreasonable under the Fourth Amendment." *United States v. Silveus*, 542 F.3d 993, 999 (3d Cir. 2008). "However, there are several exceptions to this rule." *Id.* One of those exceptions is consent, which, if given voluntarily, authorizes a warrantless search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

"When an official search is properly authorized – whether by consent or by the issuance of a valid warrant – the scope of the search is limited by the terms of its authorization." *Walter v. United States*, 447 U.S. 649, 656 (1980). The standard for measuring the scope of a person's consent is "objective reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *United States v. Baker*, 221 F.3d 438, 447 (3d Cir. 2000) (same). We must ask "what ... the typical reasonable person [would] have understood by the exchange" through which consent was obtained. *Jimeno*, 500 U.S. at 251; *see also United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990) (describing how

"the scope of a permissible search is not limitless ... [but is r]ather ... constrained by the bounds of reasonableness[.]"). Consent is "determined from the totality of the circumstances ... [and] we must examine the circumstances surrounding [the] consent ... ." *United States v. Antoon*, 933 F.2d 200, 203-04 (3d Cir. 1991). Here, those "circumstances" involve Reedy undergoing a rape kit examination.

While at the hospital, Reedy signed two consent forms before her blood was drawn for the rape kit. The first form,[40] titled "AUTHORIZATION FOR COLLECTION AND RELEASE OF EVIDENCE AND INFORMATION," provides the following:

> I, Sara Reedy, freely consent to allow Dr. Jones, M.D., his medical and nursing assistants and associates to conduct an examination *to collect evidence concerning an alleged sexual assault.* This procedure has been fully explained to me and I understand that this examination will include tests for the presence of sperm and sexually transmitted diseases and infectious diseases, as well as clinical observation for physical evidence of penetration of or injury to my person, or both, and the *collection of other specimens and blood samples for laboratory analysis.*

---

[40]We say "first" only for convenience in referring to the two forms. While both of the forms were signed on July 15, 2004, the order in which they were signed is not clear from the record.

I fully understand the nature of the examination and the fact that medical information gathered by this means may be used as evidence in a court of law or in connection with enforcement of public health rules and law.

I do ... authorize the hospital and its agents to release the laboratory specimens, medical records and related information pertinent to this incident, including any photographs, to the appropriate law enforcement officials, and I herewith release and hold harmless the hospital and its agents from any and all liability and claims of injury whatsoever which may in any manner result from the authorized release of such information.

(App. at 274 (emphasis added).)

The second consent form, titled "CONSENT FOR RAPE EXAMINATION," provides the following:

1.  I, Sara Reedy, hereby authorize Dr. Jones to perform a medical exam, including, but not limited to, a pelvic (internal) exam on my person and to record for the proper law enforcement agency and personal legal council [sic] his/her findings as related to the prosecution of my assailants.

2. I authorize the collection of necessary specimens for laboratory test [sic] *as related to my case*.

3. Any questions I had regarding the procedure(s) have been answered to my satisfaction.

(*Id.* at 525 (emphasis added).) The District Court held that the "toxicology [drug] screening would fall within the scope of the [first form], which included 'the collection of other specimens and blood samples for laboratory analysis.'" (*Id.* at 42 (quoting App. at 274).) That was the only statement the Court made to support its conclusion that the testing Evanson ordered fell within the scope of Reedy's consent. Evanson argues that the forms "obviously allowed plaintiff's blood to be drawn and tested for drugs, and the results shared with the police," (Appellees' Answering Br. at 48,) but beyond that ipse dixit, offers no explanation as to why the forms authorized Reedy's blood to be searched for evidence of drug use.

Having examined the language of the consent forms from the perspective of an objectively reasonable person in Reedy's circumstances, *Baker*, 221 F.3d at 447, we conclude that someone who had not been accused of committing any crime and who had arrived at the hospital to be examined for the purpose of evaluating the extent of her injuries and risk of disease from a sexual assault, and for the purpose of gathering physical evidence to prosecute her assailant, would not understand that she was also consenting to having her blood

63

tested a second time, at the direction of a law enforcement agent, for the purpose of collecting evidence to prosecute her.[41]

The first consent form states that Reedy is agreeing to an "examination *to collect evidence concerning an alleged sexual assault.*" (App. at 274 (emphasis added).) An objectively reasonable person in Reedy's situation would likely understand this phrase to limit her consent to the collection of evidence regarding the prosecution of her sexual assailant. Drug use had not been raised as being relevant to the sexual assault at the time that Reedy signed the form.[42] It cannot fairly be said, then, that an objectively reasonable person would understand that drug use "concern[ed]" the sexual assault when Reedy made the decision to consent.

The second form, by its title – "CONSENT FOR RAPE EXAMINATION" – identifies the scope of Reedy's consent, namely, that she was agreeing to a rape examination. In that

_____

[41]We are not suggesting that hospital personnel, acting on their own, would have been constrained by the terms of the authorization forms from subjecting Reedy's blood sample to a toxicology screen. We need not and do not address that issue. We are concerned here only with the application of Fourth Amendment principles.

[42]From Evanson's police report, it appears that evidence regarding the urine samples was shared with him during his conversation with Reedy, thus indicating that Reedy had signed the forms prior to speaking with Evanson.

form, Reedy authorized "the collection of necessary specimens for laboratory tests *as related to my case*." (*Id.* at 525 (emphasis added).) For the reasons described above, from a reasonable person's perspective, Reedy's sexual assault case was about sexual assault, not drug use. Again, at no time during Reedy's dealings with the police or the hospital prior to her signing the forms, did anyone discuss drug use with her. As a result, at the time Reedy signed that form, she could not have been expected to understand that she was consenting to have law enforcement direct the testing of her blood to show illegal drug use.[43]

---

[43]Evanson argues that the information about drug use "could have been used ... to help prove or disprove [Reedy's] sexual assault claim." (Appellees' Answering Br. at 48.) No reasoning is provided as to how drug use would have any bearing on the competing factual scenarios in play here, and we can perceive none. Evanson also indulges in a non-sequitur, suggesting that it "does not matter" that he had not yet discussed drug usage with Reedy because he "had begun to formulate ... a theory inculpating [Reedy]." (*Id.*) When analyzing the scope of consent, the test is the objectively reasonable meaning of the communication between the person obtaining consent and the person who has supposedly consented. *See Baker*, 221 F.3d at 447. It is not what an individual police officer's inner thoughts happen to be.

Evanson further argues that if Reedy "had any qualms about what she was authorizing, she could have refused to sign the forms ... ." (*Id.*) However, Evanson does not suggest what about the forms should have given Reedy qualms. While competent adults have the duty to read consent forms carefully,

In sum, we conclude that the text of these two authorization forms is insufficient to show that Reedy consented to having a law enforcement officer order medical personnel to search her blood for evidence of drug use for the purpose of incriminating her, something that is wholly apart from the sexual assault at issue here.

### iii.    *Expectation of Privacy and Consent*

The District Court also held that Reedy lost any reasonable expectation of privacy after she consented to having her blood drawn as part of the rape kit, because any subsequent testing on that blood "did not involve an intrusion below [her] bodily surface." (App. at 42.) That holding wrongly discounts the limits of Reedy's consent, effectively rendering those limits a nullity once law enforcement had access to otherwise private material.

Beyond that, the District Court's analysis misapprehends the privacy rights at stake. "A legitimate expectation of privacy exists when the individual seeking Fourth Amendment protection maintains a 'subjective expectation of privacy' in the area searched that 'society [is] willing to recognize ... as reasonable.'" *Doe v. Broderick*, 225 F.3d 440, 450 (4th Cir. 2000) (alterations in original) (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)); *see also United States v. Hartwell*, 436 F.3d 174, 178 n.4 (3d Cir. 2006) ("[A] Fourth Amendment

---

there is no duty to be skeptical that one might be consenting to something not mentioned in the forms.

search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001))). In *Schmerber v. California*, the Supreme Court held that blood "testing procedures plainly constitute searches of 'persons' ... within the meaning of [the Fourth] Amendment." 384 U.S. 757, 767 (1966). The Court noted that the "intrusions beyond the body's surface" implicate the "interests in human dignity and privacy which the Fourth Amendment protects ... ." *Id.* at 769-70. The Court reasoned that this was so because "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Id.* at 767. The District Court in this case cited to *Schmerber* but concluded that the Supreme Court intended to give Fourth Amendment protection only to "forced invasions below the body surface ... ." (App. at 41.)

To support that reading, the District Court cited our decision in *In re Grand Jury Proceedings (Mills)*, 686 F.2d 135, 139 (3d Cir. 1982), in which we held that the seizure of "facial and head hair" did not constitute a search or seizure protected by the Fourth Amendment because the evidence was "on public view." In that case, we distinguished hair samples from "blood samples, ... [where, unlike hair samples] the bodily seizure requires production of evidence below the body surface which is not subject to public view." *Id.* The District Court took our words to mean that the Fourth Amendment protects blood only when it is "below the body surface" (App. at 41), and held that Reedy had no claim because the "Fourth Amendment provides no protection for what a person knowingly exposes to the public." (*Id.* (internal quotations omitted).) The Court also

67

analogized Reedy's case to *United States v. Dionisio*, 410 U.S. 1, 8-9 (1973), in which the Supreme Court held that requiring a witness to produce voice exemplars did not violate the Fourth Amendment because someone's voice is exposed to the public.

The District Court's analogies fail because, unlike one's voice or hair, blood is not exposed to the general public, not even after it has been drawn for medical testing. Agreeing that the data produced by a blood test can be shared with law enforcement for the purpose of prosecuting a rapist is not tantamount to the unrestricted public exposure of the blood sample in the way people typically expose their voice or hair. While we did remark in *Mills* that the taking of blood samples requires an intrusion below the body surface, 686 F.2d at 139, we noted that fact only to illustrate why blood samples, as compared to hair samples, were not "on public view." Similarly, in *Schmerber*, while the Supreme Court noted that the taking of blood involves intrusion beyond the body's surface, it did not say that the blood, once drawn, is no longer subject to a reasonable expectation of privacy. Instead, the Court held that blood "testing procedures plainly constitute searches of 'persons' ... within the meaning of [the Fourth] Amendment." 384 U.S. at 767. That holding makes sense, given that an "overriding function of the Fourth Amendment is to protect personal privacy and dignity ... ." *Id.*

However, if there were any doubt about the breadth of the Supreme Court's holding in *Schmerber*, it is dispelled by the Court's subsequent decision in *Ferguson v. City of Charleston (Ferguson I)*, 532 U.S. 67 (2001), and the decision of the United States Court of Appeals for the Fourth Circuit in that case on

remand, *Ferguson v. City of Charleston* (*Ferguson II*), 308 F.3d 380 (4th Cir. 2002). In *Ferguson I*, a state hospital began performing drug tests on the urine samples of obstetric patients that met certain criteria. 532 U.S. at 71 & 72 n.4. The hospital then shared the results of those tests with law enforcement. *Id.* at 72. Several women who were arrested after their urine tested positive for cocaine filed suit, claiming that the drug tests on their urine were unconstitutional searches. *Id.* at 73. The state defended on the basis "(1) that, as a matter of fact, petitioners had consented to the searches; and (2) that, as a matter of law, the searches were reasonable, even absent consent, because they were justified by special non-law-enforcement purposes [or the 'special needs' doctrine]." *Id.*

The Supreme Court addressed the second of those two defenses, and compared the case to previous ones in which drug testing had been allowed based on the "special needs" exception. It specifically cited drug testing of U.S. Customs Service employees as part of their being considered for promotion, and testing of high school students as a condition of their participating in extracurricular activities. *Id.* at 77. The Court noted that the invasion of privacy suffered by the *Ferguson* plaintiffs was far more substantial than the privacy invasions in the "special needs" cases because, in the special needs cases, "there was no misunderstanding about the purpose of the test or the potential use of the test results, and there were protections against the dissemination of the results to third parties." *Id.* at 78. Moreover, "[t]he reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent." *Id.*

The Court further "recognized that an intrusion on that expectation may have adverse consequences because it may deter patients from receiving needed medical care." *Id.* at 78 n.14. The Court then remanded the case to the Fourth Circuit for consideration of the scope of the patient's consent. In so doing, the Court specifically admonished that "when [medical personnel] undertake to obtain ... evidence from their patients *for the specific purpose of incriminating those patients*, they have a special obligation to make sure that the patients are fully informed about their constitutional rights ... ." *Id.* at 85 (emphasis in original).

On remand, the Fourth Circuit first explained that it was "abundantly clear" from the Supreme Court that "any finding of informed consent must rest on a determination that Appellants had knowledge, from some source, that no medical purpose supported the testing of their urine for cocaine; further, Appellants must have understood that the tests were being conducted for the law enforcement purpose of obtaining incriminating evidence." *Ferguson II*, 308 F.3d at 397. The Fourth Circuit considered critical the question of whether the patients "understood that the request was *not* being made by medical personnel for medical purposes, but rather by agents of law enforcement for purposes of crime detection." *Id.* (emphasis added). After analyzing the relevant language of the consent forms, the court held that

> [nothing] in either form [] advised or even suggested to Appellants that their urine might be searched for evidence of criminal activity for law enforcement purposes. Rather, to the extent the

70

forms alerted Appellants to the possibility that their urine would be tested for drugs, Appellants were led to believe that such tests would be conducted only if an Appellant's treating physician deemed such a test advisable in the particular circumstances of that Appellant's medical care. ... [T]here is no evidence that *any* of the urine drug screens were conducted as a result of a doctor's independent medical judgment ... .

*Id*. at 399. The court thus concluded that, "as a matter of law, neither ... consent form could serve as sufficient evidence of Appellants' informed consent to the searches." *Id*. Implicit in the Fourth Circuit's holding is that the patients had a reasonable expectation of privacy in urine samples taken from them at the hospital for medical purposes.

As in *Ferguson I* and *Ferguson II*, an important inquiry about the blood samples at issue here is whether Reedy understood that her blood was being tested for the law enforcement purpose of obtaining incriminating evidence against her. The answer seems plainly to be no. She consented to having her blood drawn in the context of a rape kit examination. She had just been sexually assaulted and was being tested for sexually transmitted diseases and for potential evidence concerning her assailant. She indisputably had a reasonable expectation of privacy in her blood when it was drawn, and she did nothing to forfeit that expectation.

The Fourth Amendment protects against unreasonable government intrusion into the personal and private aspects of

life. There is little that is more personal than an individual's bodily integrity. *See Schmerber*, 384 U.S. at 772 ("The integrity of an individual's person is a cherished value of our society.") Consequently, Evanson's warrantless search of Reedy's blood for drug use, without Reedy's consent, violated the Fourth Amendment.[44] The District Court's conclusion to the contrary was error.

## C. *Claim Against Mannell*

In her amended complaint, Reedy named Mannell, the Public Safety Director for Cranberry Township, as a defendant in all of her federal claims. The District Court granted summary judgment to Mannell. Reedy argues that the District Court erred in finding that supervisory liability should not attach to Mannell.[45]

---

[44]Were it otherwise, victims of violent crime might be deterred from receiving much-needed medical care and from providing the physical evidence necessary for law enforcement to apprehend and prosecute those who commit such crimes. *Cf. Ferguson I*, 532 U.S. at 78 n.14 (warning that such an intrusion on a reasonable expectation of privacy "may have adverse consequences because it may deter patients from receiving needed medical care").

[45]In granting summary judgment to Mannell, the District Court cited to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and stated that Reedy had failed "to meet the standards needed to impose liability" against Mannell under that

72

In order to establish supervisory liability, Reedy must show that Mannell "participated in violating [her] rights, or that he directed others to violate them, or that he, as the person in charge ... , had knowledge of and acquiesced in his subordinates' violations." *Baker v. Monrow Twp.*, 50 F.3d 1186, 1190-91 (3d Cir. 1995). Reedy claims that "Mannell not only supervised, ratified and approved Evanson's investigation and charging of Reedy, but also participated along with Evanson in the events leading up to and following Reedy's arrest." (Appellant's Opening Br. at 50.) Mannell explained in his deposition that he is generally kept abreast of how investigations are going and that he is usually notified by a detective when a decision is made to take criminal charges to an Assistant District Attorney for review. However, he does not review the charges before they go to a prosecutor. With regard to Reedy's prosecution, Mannell was Evanson's supervisor during the relevant time, and Evanson kept Mannell abreast of "significant points" (App. at 569), but there is no evidence that Mannell directed Evanson to take or not to take any particular action concerning Reedy that would amount to a violation of her constitutional rights. Accordingly, we affirm the District

---

case, which deals with liability arising from constitutional violations as a result of governmental custom or policy. (App. at 43.) However, when discussing Mannell's potential liability, the parties focus on traditional principles of supervisory liability against Mannell as an individual, rather than on *Monell* liability. Accordingly, we analyze Mannell's potential liability under the doctrine of supervisory liability, as set forth in *Baker v. Monrow Township*, 50 F.3d 1186, 1190-91 (3d Cir. 1995).

73

Court's grant of summary judgment to Mannell on all of Reedy's claims.

### D. *Intentional Infliction of Emotional Distress*

Reedy brought a state law claim of intentional infliction of emotional distress against both Evanson and Meyer. The Court granted summary judgment, finding that neither Evanson's nor Meyer's conduct was "extreme and outrageous." (*Id.* at 43.)

While the Pennsylvania Supreme Court has yet to formally recognize a cause of action for intentional infliction of emotional distress, *see Taylor v. Albert Einstein Med. Ctr.*, 754 A.2d 650, 652 (Pa. 2000), the Pennsylvania Superior Court has recognized the cause of action and has held that, "in order for a plaintiff to prevail on such a claim, he or she must, at the least, demonstrate intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff." *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005) (discussing how the Pennsylvania Supreme Court has indicated that, were it to recognize a cause of action for intentional infliction of emotional distress, these would be the requirements necessary for a plaintiff to prevail on such a claim). In addition, "a plaintiff must suffer some type of resulting physical harm due to the defendant's outrageous conduct." *Id.* Liability on an intentional infliction of emotional distress claim "has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

74

*Field v. Phila. Elec. Co.*, 565 A.2d 1170, 1184 (Pa. Super. Ct. 1989).

Reedy argues that Evanson engaged in several "extreme and outrageous acts," and that the District Court erred because there was "ample evidence of Evanson['s] ... abusive treatment of her[.]" (Appellant's Opening Br. at 56.) Specifically, Reedy points to Evanson's denunciations of her, the fact that he traveled to her home and harassed her, and his recklessly-made false statements and the omissions in his Affidavit. (*Id.* at 55-57.) While one may argue whether Evanson's conduct was "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious," *Field*, 565 A.2d at 1184, we need not decide the issue, because, to succeed on an intentional infliction of emotional distress claim, Reedy must show that she suffered "some type of resulting physical harm due to the defendant's outrageous conduct." *Swisher*, 868 A.2d at 1230. Reedy has not pointed to any physical harm she suffered as a result of police conduct and, for that reason alone, her intentional infliction of emotional distress claim fails as a matter of law. We thus affirm the District Court's grant of summary judgment on that claim.[46]

---

[46]Even though Reedy names both Evanson and Meyer in her emotional distress claim, the only allegations of extreme and outrageous acts in her briefing before us pertain to Evanson. It is thus fair to wonder whether she has abandoned her emotional distress claim against Meyer. Even if not abandoned, however, Reedy's emotional distress claim against Meyer fails for the same reasons that it fails against Evanson. She has not pointed

## IV. Conclusion

In conclusion, the District Court erred in granting summary judgment to Evanson on Reedy's Fourth Amendment unlawful seizure claim and her related federal and state law claims. Viewing the facts in the light most favorable to Reedy, no reasonably competent officer could have concluded at the time of Reedy's arrest that there was probable cause for the arrest. In addition, summary judgment on Evanson's defense of qualified immunity cannot stand. The availability of the defense must be decided after fact finding by the jury to determine whether the facts as recounted by Evanson or by Reedy are more credible. We thus vacate and remand for Counts 2, 3, and 4 of the complaint, as against Evanson, to go to a jury.

The District Court also erred in granting summary judgment to Evanson on Reedy's unlawful search claim. We reverse the Court's decision with respect to Count 1 of the

---

to any physical harm suffered as a result of Meyer's actions. Accordingly, we affirm the District Court's grant of summary judgment to Meyer on Reedy's emotional distress claim.

We note also that Meyer was listed as a defendant in Count 5 of Reedy's complaint (harm to liberty interest in violation of the Due Process Clause of the Fourteenth Amendment). However, as discussed above, *see supra* note 17, that Count is subsumed by Reedy's Fourth Amendment counts, and Reedy did not name Meyer as a defendant in any of those counts.

complaint and remand for consideration of whether qualified immunity is available to Evanson on that Count.

Finally, we affirm the District Court's grant of summary judgment as to all claims against Meyer and Mannell, and as to Reedy's intentional infliction of emotional distress claim, Count 8, against Meyer and Evanson.