**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3096
_____

WARREN ERNEST BIRCHER, SR.,

                                        Appellant

v.

JAMES A. PIERCE, In his official and individual capacities;
SCOTT KROFCHEK, In his official and individual capacities
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-12-cv-00528)
District Judge: Honorable Cathy Bissoon
_____

Argued: January 23, 2015

Before: RENDELL, SMITH, and KRAUSE, *Circuit Judges.*

(Filed: May 12, 2015)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Jonathan M. Gesk, Esq.
Gesk Moritz
14 East Main Street
Carnegie, PA. 15106

Joel S. Sansone , Esq.  Argued
Suite 1700
401 Liberty Avenue
Three Gateway Center
Pittsburgh, PA. 15222
          Counsel for Appellant


Kemal A. Mericli, Esq. Argued
Office of the Attorney General of Pennsylvania
564 Forbes Avenue
Manor Complex
Pittsburgh, PA. 15219
          Counsel for Appellee

KRAUSE, *Circuit Judge*.

Warren Bircher, Sr., appeals from the District Court's decision granting summary judgment in favor of Pennsylvania State Troopers James Pierce and Scott Krofchek on his claim of malicious prosecution, specifically, his claim that they lacked probable cause to arrest him in connection with the murder of an infant known as Baby Mary.[1]  The District Court concluded that, even though the troopers recklessly omitted facts from the affidavit of probable cause in the arrest warrant, those facts were not material.  For the following reasons, we will affirm.

I.

---

[1] Because Trooper Krofchek was minimally involved in the investigation, we refer to Trooper Pierce throughout.

2

On June 4, 2000, Baby Mary's corpse was found in Cove Run Creek along Yauger Hollow Road in Lemont Furnace, Pennsylvania. Baby Mary's body was wrapped in a blue and green flannel shirt and placed inside a series of plastic bags in a backpack. The investigation into her murder went cold in 2004 but was reopened several years later by Trooper Pierce.

In June 2008, Trooper Pierce interviewed Timothy Reckner, an inmate at the Fayette County jail. Reckner told Trooper Pierce that he was at a party at The Moon, a local gathering spot, about a month before Baby Mary's death. Reckner said that a "skinny dark haired kid with long hair" told him that one of his "hos" was pregnant and that he was going to "get rid of the kid" by placing it in a bag and drowning it, the same way he disposed of animals. Reckner identified the skinny dark haired kid as Warren Bircher, Kristie Hawk-Bircher's husband, and indicated that the couple lived across from Cove Run Creek along Yauger Hollow Road.

Trooper Pierce obtained a search warrant to collect Kristie's saliva for DNA testing. The results of that test revealed that Kristie was a maternal relative of Baby Mary, meaning that one of Kristie's female relatives was Baby Mary's mother. Trooper Pierce then obtained search warrants for Kristie's sisters, including Sarah Hawk ("Hawk"), and DNA testing revealed that Hawk was Baby Mary's mother.

After Hawk was arrested and charged with criminal homicide and concealing the death of a child, Trooper Pierce conducted several interviews with her. In the first interview, which took place before she obtained counsel, Hawk admitted that she was Baby Mary's mother, that she gave birth to Baby Mary at her parents' house along

3

Yauger Hollow Road, and that "she assumed the child was dead" when she was born because "the baby did not cry or move." She also admitted that "she used a flannel shirt to wrap the child up and used several plastic bags to put the child in" before placing Baby Mary in a backpack and placing the backpack in Cove Run Creek. Hawk said that she acted alone.

Once Hawk was represented, her attorney contacted Trooper Pierce to arrange another interview, explaining that Hawk was not entirely truthful at her first interview and was going to "implicate another person." Hawk then told Trooper Pierce that, at the time of the murder, Kristie and Bircher lived in a trailer in front of her parents' house. She also said that the night she went into labor, she was at their trailer. According to Hawk, Kristie was in bed and Bircher was in the living room drinking. Hawk then said that Bircher delivered the baby, wrapped it up in a flannel shirt and plastic bags, and put it in the backpack. She stated that she put the backpack in the creek at Bircher's direction. When asked by Trooper Pierce "why she failed to provide this statement on the night she was arrested," Hawk said she didn't know.

Hawk was interviewed again after her attorney advised Trooper Pierce that she wanted to provide yet additional information about her relationship with Bircher. This time, she claimed that she had sex with Bircher on the night of Baby Mary's murder, that he knew she was pregnant, and that they had agreed to put the baby in the creek after she gave birth. Hawk then gave Trooper Pierce a written statement to that effect.

In January 2009, Bircher was arrested and charged with criminal homicide, two counts of criminal conspiracy to commit criminal homicide, and concealing the death of a

4

child. The affidavit of probable cause that Trooper Pierce provided in connection with the arrest warrant set forth (1) the circumstances surrounding the discovery of Baby Mary's body in 2000; (2) the interview with Reckner where Reckner said that Bircher told him "that someone was pregnant and he was going to get rid of the kid" by putting it in a bag and drowning it; and (3) Hawk's written statement implicating Bircher in the murder. It did not include the substance of any of Hawk's early interviews with Trooper Pierce.

Bircher spent nineteen months in pretrial custody, only to be found not guilty of all charges at the conclusion of his jury trial. He subsequently sued the troopers for malicious prosecution, asserting his arrest was made pursuant to a warrant that lacked probable cause. The District Court granted summary judgment in the troopers' favor and Bircher timely appealed.

## II.

The District Court had jurisdiction over Bircher's claims pursuant to 28 U.S.C. §§ 1331 and 1343. We have jurisdiction over this appeal under 28 U.S.C. § 1291. We exercise plenary review over the District Court's grant of summary judgment. *Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Horn v. Thoratec Corp.*, 376 F.3d 163, 165 (3d Cir. 2004)).

## III.

To prove malicious prosecution, Bircher must show that (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendants initiated the proceeding without probable cause; (4) the defendants acted

5

maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007) (citing *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)). It is undisputed that Bircher has satisfied the first, second, and fifth elements.

The main issue on appeal pertains to the third element. Bircher attempts to show that his arrest was initiated without probable cause by challenging the affidavit submitted by Trooper Pierce in connection with the arrest warrant. He argues that the affidavit omitted exculpatory evidence, i.e., evidence about Hawk's earlier statements and evidence showing Reckner's unreliability, and included unreliable inculpatory evidence, i.e., Reckner's statements and Hawk's final statement. To that end, Bircher must prove by a preponderance of the evidence that (1) the affiant "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). The District Court determined, and the troopers concede, that certain of Hawk's statements and other facts were recklessly omitted from the affidavit. The issue, then, is whether those statements and omissions were material to the finding of probable cause.

In *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000), we prescribed the analytical approach district courts should use to determine the materiality of the omissions, which we characterized as a "reconstructive surgery": The court should excise any offending

6

inaccuracies, insert the facts recklessly omitted, and then determine whether or not the "corrected" warrant affidavit would establish probable cause. *Wilson*, 212 F.3d at 789 (citing *Sherwood*, 113 F.3d at 399). If the corrected affidavit establishes probable cause, then summary judgment is proper. *Id.*

In *Wilson*, we undertook such a reconstruction by hypothesizing an affidavit of probable cause that included the exculpatory facts recklessly omitted by the arresting officer. *Id.* at 791. We then concluded that, even when "corrected," the warrant did not "undermine a finding of probable cause," *id.* at 791-92, as the inculpatory facts outweighed the newly-incorporated exculpatory ones. More recently in *Reedy v. Evanson*, the District Court reconstructed in detail an affidavit containing recklessly omitted facts. 615 F.3d at 215. We observed that the District Court's "approach was correct," even though we ultimately disagreed with its conclusion that the corrected affidavit established probable cause. *Id.* Our jurisprudence in *Reedy* as well as *Wilson* thus makes clear that when faced with the issue of whether statements and omissions were material to the finding of probable cause, a district court must reconstruct the affidavit with the recklessly omitted facts and weigh them against those originally included in the affidavit before deciding if the corrected affidavit "still established probable cause." *Id.* at 215.

Here, the District Court simply excised Hawk's statement from the affidavit and concluded that there was probable cause to arrest Bircher based only on Reckner's statement. This does not constitute the "reconstructive surgery" counseled by our case law. Nonetheless, we conclude in this case that the District Court's summary approach

7

was harmless because we look to the "totality-of-the-circumstances" when determining whether probable cause exists, *Illinois v. Gates*, 462 U.S. 213, 230 (1983), and "the facts and circumstances" within Trooper Pierce's knowledge were "sufficient in themselves to warrant a reasonable person to believe that an offense has been . . . committed by the person to be arrested," *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995); *see also Wilson*, 212 F.3d at 789 ("Probable cause exists if there is a 'fair probability' that the person committed the crime at issue."). In other words, the omitted facts, i.e., all of Hawk's statements from her previous interviews with Trooper Pierce, were not material because a magistrate could have issued an arrest warrant based on probable cause even had they been included in Trooper Pierce's affidavit. While it is true that Hawk changed her story over the course of several interviews, that alone is not enough to undermine Trooper Pierce's reasonable belief that Bircher committed the crimes at issue. Hawk's inconsistent stories may have provided fodder for impeachment at trial, but they do not negate probable cause given the particular circumstances here. When we consider the evidence of which Pierce was aware when he wrote the affidavit, including all of Hawk's statements and all of the evidence relating to Reckner, it is clear that there was probable cause.

We will, therefore, affirm the District Court's decision granting summary judgment in favor of the troopers.[2]

---

[2] Because we will affirm the District Court's decision that Bircher did not suffer a constitutional violation, we need not reach the parties' remaining arguments regarding qualified immunity, derivative absolute prosecutorial immunity, and collateral estoppel.